1
2
3
4
5
6
7
8

**IN THE UNITED STATES DISTRICT COURT**

9

**FOR THE DISTRICT OF ARIZONA**

10
11

| UNITED STATES OF AMERICA, | ) | No. CR 09-2292-TUC-FRZ (CRP) |

12

Plaintiff,                              )

13

vs.                                         )

**REPORT AND RECOMMENDATION
ON DEFENDANT'S MOTION
TO SUPPRESS STATEMENTS**

14
15

DANIEL AARON MILLER,        )

16

Defendant.                     )

17
18

Pending before the Court is Defendant Miller's Motion to Suppress Statements. (Doc. 28).  The Government filed its Response.  (Doc. 30).  The Court held an evidentiary hearing on the motion on October 12, 2010.  (Doc. 37).  Based on the testimony presented at the evidentiary hearing the Magistrate Judge recommends the District Court GRANT the motion.

**FACTUAL FINDINGS**

Defendant faces federal charges resulting from an internet child pornography investigation.  At the evidentiary hearing the Government presented the testimony of three Federal Bureau of Investigation ("FBI") agents.  Special Agent Brian Hooton testified to an initial conversation with Defendant during the search of Defendant's home in

September 2008.  The defense does not challenge this conversation between Agent Hooton and Defendant.  (Doc. 38, Transcript from Evidentiary Hearing 10/12/10 ("TR") at 3) .  Special Agent Travis Wilson testified as to the second conversation with Defendant in August 2009 at a Starbuck's.  (TR at 34).  This is the conversation challenged by Defendant.  The Government also presented the testimony of Agent Adam Radtke who was present for the second conversation at the Starbuck's between Agent Wilson and Defendant.  The final witness was Defendant, who testified on his own behalf.

Defendant became a suspect in an FBI investigation of child pornography peer to peer file sharing through a website called Limewire.  (TR at 7).  On September 19, 2008, the FBI executed a search of Defendant's residence and questioned Defendant about child pornography images found on the home computer, which Defendant shared with a housemate.  (TR at 9, 21).  Prior to the interview, Defendant was read his *Miranda* rights and informed that the interview was voluntary.  (TR at 10, 17, 20).  After the advisement of his rights, Defendant signed a *Miranda* rights form.  (TR at 10, 17, 20).

Defendant did not make any incriminating statements during that interview but he did admit to using Limewire to download images of adult pornography.  (TR at 12, 17, 18).  Defendant also stated that while downloading those images, he inadvertently came across some images that appeared to be child pornography.  (TR at 12).  He told the agents that he used the term "boys" to search for adult male pornography and the term "lesbian" to search as well.  (TR at 13, 22).  Eventually, Defendant asked the agents if someone would go to federal prison for downloading child pornography.  (TR at 23).

The duration of the interview was 20 to 30 minutes and concluded when Agent Hooton determined Defendant was no longer providing fresh information to the questions asked.  (TR at 17).  At that point, the FBI agents took the seized house computer to their office for forensic analysis. (TR at 29).  That analysis was completed between October 15, 2008 and November 12, 2008 with the report issuing to the case agent in January

2009.  (TR at 30).  By that time, Agent Hooton had been transferred to another unit so he gave the report to Agent Wilson who was now in charge of the case.  (TR at 30-31, 35).

When Agent Wilson took over the case, he believed Defendant was the one who downloaded the child pornography but he felt he needed more information to proceed with an indictment.  (TR at 36, 58).  Defendant's first statement contained no specific admission by Defendant and was, therefore, insufficient evidence that Defendant was the one who downloaded the child pornography.  (TR at 57, 36).  Agent Wilson called Defendant intending to set up an interview in which Defendant would admit that he knowingly downloaded the child pornography.  (TR at 58).

Agent Wilson originally left Defendant a message telling Defendant that he needed to talk to him right away and to call him as soon as possible.  (TR at 102).  When Defendant heard Agent Wilson's message, he believed Agent Wilson wanted to meet with him but Defendant had no intention of meeting with the agent.  (TR at 102, 103).  Later when Defendant returned Agent Wilson's call, he told the agent that he did not intend to meet with him.  (TR at 103).

After Defendant told Agent Wilson he was not interested in meeting, Agent Wilson asked Defendant if he was Mormon.  (TR at 103).  This question surprised Defendant and he asked Agent Wilson how the agent knew he was a Mormon.  (TR at 103).  Agent Wilson told him that another agent had seen something in Defendant's house during the search in September 2008 that indicated Defendant was a Mormon and the agent conveyed that information to Agent Wilson.  (TR at 103, 38).

In fact, Defendant is a devout Mormon.  He has been a Mormon for his entire life; he was raised in the Mormon church and still practices.  (TR at 97).  Defendant attends weekly church meetings, reads scriptures with his wife daily, prays, follows the rules, wears religious undergarments and tithes (giving 10% of his income to the church).  (TR at 99).  Defendant's siblings are also members of the Mormon church.  (TR at 97).

Defendant's wife became a Mormon so that Defendant could marry her and they were married in the Mormon church.  (TR at 98).

After Defendant answered "yes" he was a Mormon, Agent Wilson next offered that he was a Mormon as well and that he was a temple recommend.  (TR at 104, 38, 64). Agent Wilson told Defendant he was a temple recommend because he felt like that was a way to build trust with Defendant.  (TR at 66).  A temple recommend is a status in the Mormon faith that shows someone is in good standing with the church.  (TR at 65).  Only temple recommends are permitted to enter any of the 300 Mormon temples across the world.  (TR at 65).  To obtain a temple recommend, Agent Wilson testified a person is "interviewed by – by the church leadership to determine whether you're worthy."  (TR at 65).

Knowing that Agent Wilson was a temple recommend made Defendant feel "[k]ind of like I had to say something to him.  I had to cooperate with him."  (TR at 104). Defendant said he felt compelled to talk to Agent Wilson because he felt Agent Wilson was more worthy than him.  (TR at 104).  At one point, Defendant was a temple recommend but he testified at the evidentiary hearing that he no longer held that status. (TR at 98).  Defendant did agree that nothing in his religion requires him to talk to a temple recommend person but he emphasized he felt the religious tenet of respect for authority and general respect for law enforcement made him feel he had to talk to Agent Wilson as a temple recommend.  (TR at 111, 112).

When Agent Wilson first spoke to Defendant on the phone, Agent Wilson described Defendant as "definitely a little hesitant and [he] wasn't excited about talking to us for sure."  (TR at 37, 59).  Agent Wilson tried to "build a rapport" with Defendant and "encouraged" him to talk.  (TR at 37).  In his attempt to build rapport, Agent Wilson used their "common religion."  (TR at 38, 59).  Agent Wilson described his use of their shared religion as "an opportunity to build a rapport and have some thing in common.  I – I mean, I stated that it was something that he knew he needed to take care of [meaning the

child pornography investigation]." (TR at 60).  On cross-examination, Agent Wilson

described his use of their shared religion as, ". . . I used the – the commonalities in our

belief and the desire that we are supposed to do the right thing, whatever the right thing

is; that he should do the right thing and talk to me." (TR at 63).  Agent Wilson also

agreed that by telling Defendant he should do the right thing and talk to Agent Wilson, he

meant in terms of their Mormon religion that Defendant tell the truth and respect

authority.  (TR at 64).

Defendant understood Agent Wilson's urging for Defendant to talk to him and do

the right thing as an urging founded in their shared Mormon religion.  (TR at 110).

Defendant also testified that basic tenets of his religion required him to tell the truth,

respect authority, and respect his elders.  (TR at 106).  Defendant testified that when

Agent Wilson told him he needed to do the right thing, Defendant took that comment in

the context of the church not the FBI investigation "because [Agent Wilson] had just

mentioned the church and mentioned him being a temple recommend holder, and then

[Agent Wilson] telling me you need to do the right thing ." (TR at 106).

After discussing their common religion, Agent Wilson told Defendant "I know

what you believe and – and based on those beliefs, you know, I think it's important that

we get this taken care of." (TR at 38, 60).  Agent Wilson was referring to the child

pornography investigation and he agreed with defense counsel that he told Defendant that

Defendant needed to take care of the investigation in connection with Defendant's

Mormon religion.  (TR at 60).  Defendant testified that this statement made him feel "like

I had no choice but to meet with him and – or talk to him." (TR at 105).  Defendant

agreed with defense counsel that Agent Wilson commingled his role of FBI agent and

member of the Mormon church when talking to Defendant.  (TR at 105).

Continuing to press Defendant for an interview, Agent Wilson told Defendant "I'm

not going to arrest you, this isn't – you know, I'm not here to send you to jail; I just need

to get to the bottom of this and figure out whose pictures they were." (TR at 40).  Agent

Wilson also told Defendant "you know, I've done this before, and I – I think I have a pretty good idea of – of who these [pictures] belong to and I just need you to be honest with me."  (TR at 40).

Agent Wilson was asked how Defendant responded to his urging that Defendant meet with him.  Agent Wilson testified "[y]ou know, he was definitely hesitant, like I said.  He wasn't excited about meeting with us, but as I encouraged him more and said that we need to get to the bottom of this and it would, you know, be helpful to us, he – he agreed to meet with us."  (TR at 40).

Agent Wilson and Defendant disagree as to whether Agent Wilson told Defendant he "had" to meet with the agent.  Agent Wilson testified that he never told Defendant he "had to" meet with the agents nor did he make any overt threats or promises about what would happen if Defendant did not meet with the agents.  (TR at 40-41).  Defendant testified that while on the phone, Agent Wilson did tell Defendant he had to meet with him and that he had to talk to him and do the right thing.  (TR at 110, 115).  Agent Wilson described Defendant as "hesitant" and not "excited about meeting with us, but he finally agreed to it."  (TR at 41).  Defendant testified that he went to the meeting at Starbuck's because "I felt like I had no choice."  (TR at 106).  Based on the phone conversation, Defendant testified that he did not feel free to not go to the meeting at Starbuck's.  (TR at 106).

During their initial phone conversation, Defendant asked Agent Wilson if he could bring his wife to the meeting.  Agent Wilson "suggested" that Defendant come to the meeting alone but did not tell Defendant that he must come alone.  (TR at 42).  Defendant testified that regarding his wife, Agent Wilson told him "I wouldn't bring her.  You shouldn't tell her anything about it until this is over with."  (TR at 107).  As Agent Wilson recollected, Defendant "talked about bringing his wife and I didn't think that it would be something that she would want to hear, nor did I think that he would open up as much that I would hope that he would if his wife was there."  (TR at 42).  When asked by

the prosecutor "[d]id you let him know it was up to him whether or not he brought his wife?", Agent Wilson answered "I said that – I suggested.  I said I would not bring my wife if I were you."  (TR at 42).  On cross-examination, Agent Wilson said he told Defendant he should not bring his wife and he should come alone.  (TR at 70).  He also told Defendant that he should not discuss it with his wife.  (TR at 70).

Defendant ended up not taking his wife to the Starbuck's meeting because he was following Agent Wilson's advice to not bring her.  (TR at 107).  At that point, Defendant had already told his wife about the child pornography investigation.  (TR at 63).

Agent Wilson decided to meet with Defendant at a Starbuck's close to Defendant's home because Agent Wilson wanted a location that was "neutral" where Defendant "would feel comfortable, someplace near his home, someplace that it would be easy for him to meet."  (TR at 41).  When asked again why he selected Starbuck's, Agent Wilson testified "I just wanted it to be a comfortable place where we could talk and he wouldn't feel like he was threatened or that there was any reason that – that he had to think that we were there for any other reason than just to talk to him."  (TR at 42).

Prior to the meeting, Defendant called Agent Wilson and told him he was not feeling well and would like to postpone the meeting.  (TR at 42-43, 67-68, 108).  Agent Wilson told Defendant "I think we need to get this taken care of, the sooner you get this taken care of, the better it is for everybody."  (TR at 43).  When asked on cross-examination, whether it really was better for Defendant to talk to the agents, Agent Wilson stated "[w]ell, it depends on your defit – definition of better, but it wasn't probably better for him in a legal standpoint."  (TR at 69).  The defense attorney followed up Agent Wilson's response with "[w]ould it have been – what other situation – I mean, that's what we're talking about here, that's what you were doing then was being a special agent with the FBI, looking for a confession from this man."  (TR at 69).  Agent Wilson responded "I certainly was looking for a confession from this man."  (TR at 69).

For his part, Defendant testified that when he called Agent Wilson to tell him he did not feel well,  he intended "[t]o avoid going to the meeting, period."  (TR at 108). When the prosecutor pointed out on cross-examination that Defendant never actually said he wanted to "cancel" the meeting but rather said only that he wanted to postpone it, Defendant analogized it to postponing a date that you did not want to go on but you did not want to be rude and say no.  (TR at 114).  He said "you don't want to be rude and say I'm cancelling, so you kind of just postpone it and postpone it and postpone it till eventually they just quit bugging you kind of thing."  (TR at 114).  He testified that he twice during the conversation told Agent Wilson that he did not want to go to the meeting.  (TR at 108).

At the end of the conversation, Defendant agreed to keep the meeting with Agent Wilson.  (TR at 43).  Defendant testified that he went to the meeting because he felt like he had no choice and Agent Wilson "told me I had to go meet with him."  (TR at 108). Agent Wilson did not bring up their shared Mormon religion during this phone conversation.  (TR at 108).  On redirect, Agent Wilson testified that he felt like Defendant would feel better if he met with Agent Wilson sooner rather than later because he knew it was something on Defendant's mind as Defendant had talked on the phone about "getting this done with" and "being done with it."  (TR at 78).  He also testified that Defendant never tried to cancel the meeting, only to postpone it.  (TR at 79).

Defendant met with Agent Wilson and Agent Radtke on September 1, 2009 at the agreed upon Starbuck's.  (TR at 45).  For the interview, the agents were dressed in casual clothing; Agent Wilson was dressed in jeans and a loose-fit shirt with a concealed firearm.  (TR at 47).  Agent Radtke's firearm was also concealed.  (TR at 47).  Agent Wilson testified that Defendant did not appear uncomfortable at the beginning of the interview but did seem "a little bit" nervous.  (TR at 48, 71).  Upon meeting, Agent Wilson asked Defendant if he wanted anything to drink and when Defendant said he did

not have any money on him, Agent Wilson offered to buy him a smoothie.  (TR at 71).

Agent Wilson bought smoothies for himself and Defendant.  (TR at 71).

The interview began with talk of their shared religion.  Agent Wilson testified they talked about their shared Mormon faith for two or three minutes and that the entire interview lasted approximately 30 to 45 minutes.  (TR at 71-72).  Defendant testified that he and Agent Wilson discussed each going on a church mission.  (TR at 105).  Defendant told Agent Wilson that his uncle was a member of the Avra Valley Ward, like Agent Wilson.[1]  (TR at 74, 61-62).  Agent Wilson told Defendant that the president of the North Stake, Todd Pauley, worked for the FBI.[2]  (TR at 75, 76).  Agent Wilson testified that he brought up Stake President Pauley to build rapport because Pauley was a common person that both he and Defendant would know.  (TR at 76).  Agent Wilson stated he made no insinuations about Defendant needing to talk to him because of President Pauley.  (TR at 77).  Defendant testified that he recognized the name of President Pauley but did not personally know him.  (TR at 109).  Agent Wilson's mention of the name of a stake president "put a little bit of fear in [Defendant] . . ." and intimidated Defendant.  (TR at 116).  Although, Defendant acknowledged, Agent Wilson never said that he would tell the stake president about the child pornography investigation.  (TR at 116).

Before they began talking at the Starbuck's, Agent Wilson did not tell Defendant that the interview was voluntary.  (TR at 72).  He did not tell Defendant he could leave at

---

[1] As described by Agent Wilson, a "ward" is a group within the Mormon church, usually defined by a geographical area.  (TR at 61).

[2] Agent Wilson agreed with defense counsel's characterization that in the Mormon church the wards are assigned to a larger group called stakes and Agent Wilson and Defendant were both part of the North Stake which was presided over by a president who was also a member of the FBI.  (TR at 75).  Although, in his testimony, Defendant stated he was in a different stake than the Avra Valley Ward where Agent Wilson was a member.  (TR at 101).

any time.[3]  (TR at 72).  And, he did not read Defendant his *Miranda* rights.  (TR at 72).

Agent Wilson did tell Defendant before the interview and during the interview that he

would not be placed under arrest at any time during the interview and that he was free to

come and go as he pleased.  (TR at 50).

Defendant testified that he went to the Starbuck's to talk to Agent Wilson because

he felt he had no choice.  (TR at 110).  Defendant said "[h]e made me feel like religious-

wise I had to talk to him, that he knew people, and especially after he mentioned the stake

president's name that he knew people that could have stuff happen and – you know, and

he said, you know, you work for – you still work for the department of corrections, right?

Kind of in the tone that made me feel as if he was going to, you know, contact my work."

(TR at 110).  The agent contacting Defendant's work was a realistic concern for

Defendant.  Back in September 2008 after the FBI executed its search warrant and

interviewed Defendant, Defendant discovered the next day that the FBI had contacted his

employer, the Arizona Department of Corrections, and informed them of the

investigation.  (TR at 96).

For the interview at Starbuck's, Defendant sat closest to the door and the agents sat

together on the other side of the table.  (TR at 49).  The agents never told Defendant that

he needed to stay at the interview.  (TR at 49).  Agent Wilson testified that at the

beginning of the interview the agents told Defendant he would not be placed under arrest,

---

[3] There was some confusion on this point during the prosecutor's cross-examination of
Defendant.   On cross-examination of Defendant, the prosecutor characterized Agent
Wilson's testimony as Agent Wilson telling Defendant that he was free to leave at any time
and he did not have to meet with the agents.  (TR at 113).   This was not a correct
characterization of Agent Wilson's testimony.  When asked directly by the prosecutor
whether Agent Wilson told Defendant that he did not have to meet with the agents and that
he was free to leave at any time, Agent Wilson asked to refer to his report, he reviewed his
report and then said "You know, I don't remember telling him that, that he could leave at any
time.  I may have, but I don't remember specifically saying that."  (TR at 49-50).  In fact, this
is not what Agent Wilson said.  Agent Wilson said he did not tell Defendant those things but
that Defendant was free to leave and the talk was voluntary.  (TR at 50).

that he was free to come and go as he pleased.  (TR at 50).  When asked by the prosecutor, Agent Wilson answered "no" Defendant never expressed a desire to stop talking, terminate the interview, or leave.  (TR at 50).

Agent Wilson testified that very soon after he brought the smoothies to the table, Defendant asked him if he needed a lawyer or if he should have an attorney.  (TR at 55, 72).  Agent Wilson, on direct examination, testified that he told Defendant he "could not give legal advice and that was up to him."  (TR at 55-56).  Defendant recalled Agent Wilson telling Defendant that he would let Defendant know when he needed to get an attorney.  (TR at 107).  The prosecutor then asked Agent Wilson "so did you let him know that he had the choice whether or not he – he could have an attorney if he wanted to –" to which Agent Wilson answered "yes".  (TR at 56).  Agent Wilson testified that Defendant did not ask for an attorney at any time during the interview and did not hesitate to speak with the agents after initially asking if he needed an attorney.  (TR at 56).  On cross-examination, Agent Wilson agreed that he never offered Defendant the chance to get up and go call a lawyer; instead, Agent Wilson stated "[h]e was free to get up at any time."  (TR at 73).

This was a memorable interview for Agent Wilson.  He testified "[i]t was actually one of the – one of the interviews in my career that I remember above many of my others only because he was – it seemed like it was a relief for him to be able to talk about this."  (TR at 48).  Defendant began crying at one point.  (TR at 49).  Agent Wilson testified "[y]ou know, it was just a very emotional, cathartic interview it felt like.  He was open and honest with us and we were open and honest with him."  (TR at 49).

During the interview, Defendant talked about sexual abuse he suffered as a young child and how difficult that had been for him.  (TR at 51).  He described to agents how while attempting to download music he came across images of child pornography and how those images reminded him of the abuse he had suffered.  (TR at 51).  He stated that he would periodically have feelings that he needed to view the images again to be

reminded of the abuse that he suffered.  (TR at 51).  He also told the agents that he, on other occasions, sought ought images of child pornography.  (TR at 52).

**CREDIBILITY OF THE WITNESSES**

The Ninth Circuit's model jury instruction instructs jurors, the triers of fact, to consider the following in making a determination of witness credibility:

1. The witness's opportunity and ability to see or hear or know the things testified to;
2. The witness's memory;
3. The witness's manner while testifying;
4. The witness's interest in the outcome of the case, if any;
5. The witness's bias or prejudice, if any;
6. Whether other evidence contradicted the witness's testimony;
7. The reasonableness of the witness's testimony in light of all the evidence; and
8. Any other factors that bear on believability.

FedCrim-JI9C 1.7 Credibility of Witnesses.  The Magistrate Judge finds two of the three agents, Agent Hooton and Agent Wilson both testified credibly as did Defendant.

Agent Hooton testified first and stated he has worked with the FBI as a special agent for the past six and a half years.  (TR at 7).  Agent Hooton appeared forthright in the witness chair.  He recalled in detail the search of Defendant's home and the first interview with Defendant.  (TR at 7).  He also created a three-page report summarizing the events of the search and interview.  (TR at 17).  Agent Hooton's account of the search and first interview are not challenged by Defendant.

Agent Wilson testified next.  Agent Wilson has worked as a special agent with the FBI for the past six years.  (TR at 34).  In 2008, Agent Wilson was working as a cyber agent investigating child pornography crimes.  (TR at 34).  His demeanor on the stand was relaxed and serious.  He recalled significant detail in the interactions he had with Defendant and he admitted when he did not recall a fact.  Agent Wilson testified credibly and candidly during the evidentiary hearing.

Defendant testified in his defense.  He is 31 years-old and currently working at a feed store.  He was formerly employed with the Arizona Department of Corrections.  (TR at 95).  Defendant resigned from his corrections job in lieu of dismissal from it in December 2009 after he was indicted in this case.  (TR at 96).  On the stand, Defendant was soft-spoken but answered the questions asked in a straight-forward manner and did not hesitate in his responses.  Defendant testified credibly.

The final agent to testify, Agent Adam Radtke, accompanied Agent Wilson to the interview with Defendant at Starbuck's.  (TR at 83).  The Court gives Agent Radtke's testimony little weight.  Agent Radtke testified that he was unfamiliar with the investigation of Defendant prior to accompanying Agent Wilson to Starbuck's.  (TR at 83).  In his own words, Agent Radtke accompanied Agent Wilson to the second conversation with Defendant because Agent Wilson "needed an extra body to go out and do this interview" so Agent Radtke "went out and helped him."  (TR at 83).  Agent Wilson testified that Agent Radtke accompanied him for two reasons.  First, "it's helpful to have at least two persons present to be able to provide testimony that what was – what's stated in the report is true and accurate."  (TR at 45).  Second, Agent Radtke was working in public corruption matters and, as Defendant was an employee of the Arizona Department of Corrections, the agents thought he might be able to offer some information on corruption he may have observed.  (TR at 45).

Agent Radtke's recollection of the facts was inconsistent with the recollections of both Agent Wilson and Defendant on many important points.  When asked if Defendant ever requested an attorney, Agent Radtke answered "no".  (TR at 87).  When Agent Radtke was cross-examined on this point, Agent Radtke testified that he did not remember if Defendant asked for an attorney.  (TR at 91).  In fact, both Agent Wilson and Defendant testified that Defendant asked if he should get an attorney.  (TR at 55, 72, 107).

1    When asked whether Agent Wilson discussed religion with Defendant, Agent
2  Radtke testified that it was brought up only in initial small talk.  (TR at 89).  Specifically
3  when asked by the prosecutor what Agent Wilson and Defendant talked about during the
4  small talk, Agent Radtke said "[j]ust current events.  You know, they shared common
5  religion.  And I think that was about.  I mean just random small talk."  (TR at 86).  In fact,
6  the talk was not random.  Agent Wilson testified at length about how he used his common
7  Mormon religion to build rapport with Defendant and Agent Wilson said nothing about
8  talking with Defendant about current events.  (TR at 75-77).  Defendant also testified as
9  to the detailed conversation he had with Agent Wilson about their shared faith while at
10  the Starbuck's.  (TR at 105).  When pressed on cross-examination about the specifics of
11  the Mormon religion small talk, Agent Radtke had no recollection.  (TR at 91-92).

12    Agent Radtke also testified that he and Agent Wilson told Defendant that
13  Defendant could leave at any time and that Defendant did not have to talk to them.  (TR
14  at 86).  In fact, Agent Wilson testified that he did not tell Defendant that he did not have
15  to talk to them.  (TR at 72).

16    Agent Radtke also gave conflicting testimony on other facts.  Agent Radtke
17  described Defendant as "pretty nervous throughout the whole interview, if I remember."
18  (TR at 85).  Later in his testimony, he again described Defendant as "very nervous"
19  during the interview.  (TR at 87).  In contrast, Agent Wilson described Defendant as "a
20  little bit" nervous at the beginning of the interview and then relieved as he began to talk.
21  (TR at 48, 71).  Agent Radtke did not remember whether he got up to get Defendant
22  Kleenex when he was crying; Agent Wilson and Defendant both testified that Agent
23  Radtke was the one who got up to get a napkin for Defendant.  (TR at 94, 49).  Agent
24  Radtke agreed that he attended to the interview because it was FBI policy for two agents
25  to be present during an interview.  (TR at 92).  Agent Radtke did not write on a report on
26  the interview and reviewed Agent Wilson's report prior to the evidentiary hearing.  (TR at
27  93).
28

1    Agent Radtke's memory of the Starbuck's interview was unimpressive.  He was
2    not involved in the case prior to the Starbuck's interview, he was not active in the
3    interview until it was essentially over and Defendant explained the structure of the
4    prisons where he worked, and Agent Radtke did not write a report after the interview.
5    When asked details about the interview, Agent Radtke most often could not remember
6    them or remembered the details differently than both Agent Wilson and Defendant.  The
7    Magistrate Judge finds Agent Radtke was not a credible witness.

8    The Magistrate Judge points out that this is another case in which the Government
9    is left with the recollection of facts from one law enforcement agent pitted against a
10   defendant's recollection of the facts.  This Court is asked to determine whether Agent
11   Wilson was psychologically coercive in his communication with Defendant such that
12   Defendant felt he was not free to leave, and therefore in custody, or that Defendant's will
13   was overborne by Agent Wilson's coercive tactics and his confession was not voluntary.

14   Significant to this Court is Agent Wilson's characterization of the Mormon faith
15   discussion.  Agent Wilson describes this conversation as building rapport with Defendant.
16   In contrast, Defendant felt the conversation about religion gave him no choice but to go to
17   the Starbuck's and once there, stay and talk to Agent Wilson about the child pornography
18   investigation.  Also concerning to this Court is Agent Wilson's testimony that Defendant
19   asked whether he needed a lawyer and his recollection that he told Defendant he was not
20   a lawyer and could not give legal advice.  Defendant remembers it differently, that Agent
21   Wilson told him he would let him know when he needed an attorney.
22
23   The Government had the complete ability to avoid any factual dispute.  Recording,
24   audio or video, would have provided conclusive evidence to support Agent Wilson's
25   recollection or Defendant's recollection.  The Court could have known how long Agent
26   Wilson and Defendant talked about their shared Mormon faith, how much Agent Wilson
27   pushed Defendant with the name-dropping of the stake president and the need to do "the
28   right thing".  There would have been no factual question concerning how Agent Wilson

replied to Defendant's question about whether he should get an attorney.  There would have been less of a question as to whether Defendant voluntarily made a statement.  But here the Government chose to make no recording.  In lieu of a recording, the Government offers the testimony of Agent Radtke.  An agent who has little recollection of the interview and remembers much of the interview inaccurately or does not remember other parts of it at all.  Agent Radtke's testimony is of no use to corroborate the testimony of Agent Wilson.

The advantages to recorded statements are clearly apparent.[4]  Law enforcement officers would not be falsely accused of improper tactics.  If government agents abused a defendant's rights, those abuses would be readily provable, thus discouraging such abuses.  Government lawyers could review the video or audio recording and make more appropriate issuing decisions.  Judges and juries would be presented with voluntariness disputes much less frequently.  And law enforcement agents would not be placed in the difficult situation where the unverifiable nature of the facts and the pressure to obtain a conviction frames the testimony they are required to give.

All parties benefit from the simple act of recording the interview.  As this case points out, without that recording, the Government can be left without any corroboration of its agent's version of the events.  Providing that corroboration in an irrefutable way is almost always completely within the control of the Government.  Here, the Government chose not to provide that corroborating information.

**ANALYSIS**

***Miranda* and Custody**

The Fifth Amendment states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ."  U.S. Const. amend. V.  To protect this

---

[4]

 *See* Thomas P. Sullivan, *Police Experiences with Recording Custodial Interrogations*, 88 Judicature 132 (2004 WL 3153773).

right, the Supreme Court requires that prior to any custodial interrogation, a person must be informed of his right to remain silent, that his statements may be used against him, and that he has the right to the presence of an attorney. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). These heightened procedural safeguards are meant to balance the "compulsion inherent in custodial surroundings." *Id.* at 458. Custodial interrogation has two requisite parts: custody and interrogation. *Id.* at 444. A person is in custody when his "freedom of action is curtailed to a degree associated with formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) (internal citation omitted). Interrogation includes express questioning and any words or actions from police "that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 300-301 (1980).

The parties do not dispute that Defendant was interrogated at the Starbuck's. At issue is whether Defendant's freedom of action was curtailed to a degree associated with formal arrest such that the agents were required to advise Defendant of his *Miranda* rights. This Court finds that Defendant was not in custody.

When a suspect has not been formally arrested and taken into police custody, he is nonetheless "in custody" so as to be entitled to the warnings prescribed by *Miranda* if he has been "deprived of his freedom of action in any significant way." *United States v. Craighead,* 539 F.3d 1073, 1082 (9th Cir.2008) (internal citation omitted). In making this determination, a court looks at the totality of the circumstances and asks whether a reasonable person in those circumstances would have felt at liberty to terminate the interrogation and leave. *Id.* Factors relevant to this determination include (1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual. *United States v. Beraun-Paunez,* 812 F.2d 578, 580 (9th Cir.1987), *modified on other grounds United States v. Beraun-Panez*, 830 F.2d 127 (9th Cir.1987).

In the case before this Court, Agent Wilson called Defendant with the express purpose of setting up a confessional interview.  Agent Wilson claims he told Defendant he "should" meet with the agent.  Defendant disagrees, testifying that Agent Wilson told him he "had" to meet with the agent.  When a suspect has "agreed to accompany" officers to a police station or interrogation room, courts have been less convinced that the suspect was in custody.  *See United States v. Bassignani*, 575 F.3d 879, 884 (9th Cir.2009), *quoting United States v. Crawford*, 372 F.3d 1048, 1059 (9th Cir.2004) (*en banc*).  When officers give an order or instruction, this factor weighs in favor of custody.  *Id.* (Officers ordered suspect to "remove himself from the computer" and "instructed" him to go to the conference room.  The Court found suspect did not voluntarily agree to accompany the officers).  The Ninth Circuit has relied heavily on an officer's statement to a defendant that the defendant is not under arrest to determine the defendant was not in custody.  *Crawford*, 372 F.3d at1060.

Agent Wilson and Defendant disagree as to whether Agent Wilson told Defendant he "should" meet with him or told him he "had" to meet with the agent.  The Court finds this factual discrepancy is not critical to determining whether Defendant was in custody.  Even if the agent told Defendant that he "had" to meet with the agent, the overall tone of the conversations between Agent Wilson and Defendant was persuasive more than commanding.  Agent Wilson spent significant time trying to "build rapport" with Defendant and discussing their common religion and how it was important to "do the right thing" in terms of their religion.  This scenario is distinguishable from a officer "instructing" a suspect to meet with the officer.  Agent Wilson did not command or use something akin to an order to get Defendant to agree to a meeting.  Instead, Agent Wilson persuaded Defendant as a confidant or advisor that Defendant should meet with the agent.

Based on the testimony as a whole, including Agent Wilson's repeated statement to Defendant that he needed to do the right thing, Defendant likely did feel that he had no choice in meeting with the agent.  Yet, Agent Wilson did tell Defendant that he would not

be arrested and that he could come and go as he pleased.  The first factor weighs in favor of finding Defendant was not in custody because Agent Wilson told Defendant that he was free to leave and not under arrest and Agent Wilson persuaded Defendant to meet rather than ordering that he meet with the agent.

As to the second factor, Defendant was not confronted at the Starbuck's with much evidence of his guilt.  There is no evidence that the agents showed Defendant photographs they retrieved from his computer or even told Defendant that they thought he was guilty.  Agent Wilson did tell Defendant on the initial phone call that he was experienced in child pornography investigations and he had a "pretty good" idea of who downloaded the photographs and that Defendant just needed to be honest with him.  Agent Wilson also spent much of the initial phone conversation encouraging Defendant to do the right thing in the context of their shared Mormon faith.  At the Starbuck's, however, the agents did not confront Defendant with evidence of his guilt.  This second factor weighs in favor of finding Defendant was not in custody.

Factors three and four, the place of the interrogation and the length of the interrogation, both weigh in favor of the Government.  The interview was conducted at a Starbuck's.  It was an open environment and Defendant sat closest to the exit door with the two agents on the other side of the table.  The length of the interview was approximately 30 to 45 minutes.  Neither of these factors weighs in favor of finding custody.

The final factor, the degree of pressure placed on Defendant to detain him weighs in favor of Defendant.  Here, Agent Wilson applied significant psychological pressure on Defendant to get Defendant to meet with him.  In their initial phone conversation, Agent Wilson presented himself to Defendant, who he knew was a Mormon, as a temple recommend Mormon who was in good standing with the church.  He told Defendant he needed to "do the right thing" and meet with him.  Agent Wilson described Defendant as "definitely a little hesitant" and "[not] super excited to talk[] to [the agents]."  Agent

Wilson used his common religion with Defendant and the basic tenets of their religion, honesty and respect for authority, to convince Defendant to talk with him.  Agent Wilson counseled Defendant through the phone conversation and the interview at Starbuck's that he should do the right thing by his faith and tell Agent Wilson who downloaded the child pornography.  Agent Wilson also dropped the name of his Mormon stake's president and told Defendant that the stake president worked for the FBI.  Knowing an authority figure in his church also worked for the FBI must have been intimidating to Defendant, particularly because the FBI had already informed his employer once about the investigation.  The fifth factor weighs in Defendant's favor.

The Court finds, when it considers all five factors, Defendant was not in custody and therefore, law enforcement was not required to inform Defendant of his *Miranda* rights.  Such a finding in a child pornography investigation, though, concerns this Court.  Penalties for possession of child pornography are substantial.  The scenario from this case is typical of child pornography investigations.  Usually, the investigation resumes six months to a year after computers were seized from the suspect.  Immediate arrest of the defendant is almost never anticipated.  Suspects are routinely told they will not be arrested and just as routinely agents make a conscious decision not to *Mirandize* the defendant.  The legality of that must be determined on a case by case basis, but it is troubling that for a certain crime, possession of child pornography, the important protections of *Miranda* warnings is for all practical purposes non-existent.

**Voluntariness**

The Fifth Amendment guarantees that "no person ... shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  An involuntary statement by a defendant violates the Due Process Clause of the Fifth Amendment. *United States v. Miller,* 984 F.2d 1028, 1030 (9th Cir.1993) (internal citation omitted).  In assessing voluntariness, "coercive police activity is a necessary predicate to finding that a confession is not 'voluntary'." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).  The

1    coercive police activity must be causally connected to the confession.  *Id*. at 164.  An

2    admission "is involuntary if coerced either by physical intimidation or psychological

3    pressure."  *United States v. Shi*, 525 F.3d 709, 730 (9th Cir.2008) (internal quotation

4    omitted).  Courts look to see "whether a defendant's will was overborne by the

5    circumstances surrounding the giving of a confession."  *Dickerson v. United States*, 530

6    U.S. 428, 434 (2000) (internal quotation marks omitted).

7           When assessing the voluntariness of an admission, courts consider "the totality of

8    all the surrounding circumstances-both the characteristics of the accused and the details of

9    the interrogation."  *Mickey v. Ayers*, 606 F.3d 1223, 1233 (9th Cir.2010) (internal

10   citations omitted).  The characteristics of the accused include factors such as his age,

11   intelligence level, familiarity with the criminal justice system, and the details of the

12   interrogation.  *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973).  The government

13   must prove that a confession is voluntary by a preponderance of the evidence. *Lego v.*

14   *Twomey*, 404 U.S. 477, 489 (1972).

15          This Court must consider whether Agent Wilson employed coercive tactics to

16   obtain Defendant's confession and if the tactics were coercive, were they sufficiently

17   manipulative to overbear the will of a person with Defendant's characteristics.  The Court

18   finds Agent Wilson's tactics were coercive such that Defendant's will was overborne.

19          The Court begins with Agent Wilson's coercive tactics.  From the first

20   conversation Agent Wilson had with Defendant through the interrogation at the

21   Starbuck's, Agent Wilson hid the legal nature of his contact with Defendant.  He asserted

22   himself as a spiritual counselor to Defendant and maintained that role through the

23   interrogation at Starbuck's.  He counseled Defendant to "do the right thing" - advice both

24   he and Defendant believed the agent made in the context of their religion.  Agent Wilson

25   also withheld information about Defendant's right to an attorney and made misstatements

26   about his intent in talking with Defendant.  Agent Wilson purposely created a false

27

28

environment in which he intended Defendant to feel that the agent was just at the Starbuck's to "talk" to Defendant and nothing else.

Of particular concern to this Court is Defendant's question to Agent Wilson about whether he should get an attorney.  Defendant's question about his need for an attorney is an inquiry into whether his meeting with Agent Wilson at Starbuck's had legal consequences.  Was this an interrogation with legal ramifications?  Could he be in trouble?  By asking whether he needed an attorney, Defendant was attempting to gather all the considerations he needed to weigh his decision about whether he wanted to talk to the agents.

Defendant had limited prior experience with interrogation.  The only other time Defendant was interrogated, it was a much different experience.  Back in September 2008, Defendant was interrogated by Agent Hooton while Defendant's house was being searched.  At that time, Agent Hooton read Defendant his *Miranda* rights and then asked him some questions.  This scenario was Defendant's familiarity with interrogation.  While Defendant talked with the agents, he did not confess.  Eleven months after that initial interrogation, Defendant was trying to discern - was the meeting at Starbuck's an interrogation or not?

Defendant's inquiry into the need for an attorney was an effort to determine if the meeting at Starbuck's was like the interrogation outside his house in September 2008. Agent Wilson did not answer Defendant directly about his right to an attorney.  Rather, Agent Wilson told Defendant either "I'm not an attorney.  I can't give legal advice and that was up to [Defendant]" or he told Defendant, according to Defendant, that "he would let [Defendant] know when he needed an attorney."  Agent Wilson's response to Defendant, by either his recollection or Defendant's recollection, did not inform Defendant of his right to an attorney and therefore, hid from Defendant the legal significance of the interrogation.

1    While this Court views either response by Agent Wilson as coercive of

2  Defendant's right to an attorney, the Court resolves the factual discrepancy in favor of

3  Defendant.  Given the role Agent Wilson constructed for himself as a counselor to

4  Defendant, it seems more plausible that Agent Wilson continued his role of counselor by

5  advising Defendant that he would tell Defendant when he needed to get an attorney.  Such

6  a factual conclusion is also supported by the great efforts Agent Wilson put forth to create

7  an environment in which he did not need to advise Defendant of his *Miranda* rights.

8  Included in those efforts were Agent Wilson's statements that Defendant was not under

9  arrest and Agent Wilson was not there to send Defendant to jail as well as Agent Wilson's

10  decision to conduct the interrogation in a public venue - a coffee shop.

11    By side-stepping Defendant's question about his need for an attorney, Agent

12  Wilson acted coercively in not informing Defendant of his right to an attorney when

13  Defendant asked about one.  The Supreme Court in *Miranda* took care to point out that

14  *Miranda* was "not an innovation in [the Court's] jurisprudence" but rather was "an

15  application of principles long recognized and applied in other settings."  384 U.S. at 442.

16  Those constitutional principles include the right against self-incrimination and the right to

17  an attorney.  *Id*.  *Miranda* set out a group of warnings that must be given when a person is

18  interrogated while in custody.  These warnings, while not required in non-custody cases,

19  still protect against government violation of a person's constitutional rights.

20    Defendant in this case, while not in custody at the Starbuck's, still had the

21  constitutional right to be free from self-incrimination and to have the assistance of an

22  attorney.  When Defendant asked whether he needed an attorney and the agent side-

23  stepped this question, the agent was coercively acting against Defendant's constitutional

24  rights.  While Defendant was not in custody and therefore not entitled to *Miranda*

25  warnings, Agent's Wilson's decision to not inform Defendant of his constitutional rights

26  affected Defendant's ability to weigh competing considerations and give a voluntary

27

28

1    statement that was the product of his understanding the considerations.  *See Miller*, 984

2    F.2d at 1031.

3         Agent Wilson acted coercively in other significant ways.  Troubling to the Court is

4    Agent Wilson's focus on creating a false environment that made it appear as if no

5    criminal interrogation was occurring.  Agent Wilson began creating this false

6    environment in his initial discussion with Defendant about their shared Mormon faith.

7    Agent Wilson asserted himself as a worthy temple recommend Mormon and counseled

8    Defendant to "do the right thing" in terms of their shared religion.  Agent Wilson also

9    sought to get Defendant alone for the interrogation.  Defendant asked specifically if he

10   could bring his wife to the Starbuck's and Agent Wilson counseled against it.  Agent

11   Wilson told Defendant that he should come alone, not bring his wife, and not even tell his

12   wife "anything about it until this is over with."  (TR at 70, 107).  Agent Wilson gave that

13   advice to Defendant, in part, because Agent Wilson did not think "that [Defendant] would

14   open up as much that I would hope that he would if his wife was there."  (TR at 42).

15        Agent Wilson also made false statements to Defendant in an effort to get him to

16   come to the Starbuck's and then while at the Starbuck's, in an effort to get Defendant to

17   confess.  Significant to this Court is Agent's Wilson's statement to Defendant that Agent

18   Wilson did not intend to send Defendant to jail or arrest him.  In their initial phone

19   conversation Agent Wilson told Defendant, "*I'm not going to arrest you*, this isn't - you

20   know, *I'm not here to send you to jail*; I just need to get to the bottom of this and figure

21   out whose pictures they were."  (TR at 40) (emphasis added).  In fact, Agent Wilson's

22   express purpose in arranging a meeting with Defendant was to obtain a confession to use

23   in a criminal case against Defendant.[5]  Agent Wilson's statement to Defendant that he was

24   not there to send Defendant to jail is a complete deception; Agent Wilson's goal was to

25   obtain a confession that would be used to convict Defendant.  The statement "I'm not here

26

27   _____

     [5] Agent Wilson testified "I certainly was looking for a confession from this man."  (TR at

28   69).

- 24 -

to send you to jail" is close to an implied promise to Defendant that he would not suffer legal ramifications for talking with Agent Wilson.

The other statement, made numerous times by Agent Wilson on the phone and at the Starbuck's, was Agent Wilson's statement, "I'm not going to arrest you."  While this statement is true in the immediate sense, it is another deception in that it suggests there are not criminal ramifications for talking with the agent.

An interrogator is permitted to make false statements to suspects, but false statements made by the interrogator can affect the voluntariness of a confession.  *Frazier v. Cupp*, 394 U.S. 731, 737, 739 (1969) (false statement by police officer that detainee's cousin had confessed, while relevant to issue of voluntariness, was insufficient to make otherwise voluntary confession inadmissible).  The Ninth Circuit has held that "deception does not render [a] confession involuntary ... as long as the decision is a product of the suspect's own balancing of competing considerations, the confession is voluntary."  *Miller,* 984 F.2d at 1031 (internal citations omitted).

Also coercive was Agent Wilson's selection of the Starbuck's for the interrogation.  Agent Wilson testified that he selected the Starbuck's because "I just wanted it to be a comfortable place where we could talk and he wouldn't feel like he was threatened or *that there was any reason that - that he had to think that we were there for any other reason than just to talk to him*."  (TR at 42) (emphasis added).  Agent Wilson selected an environment that appeared innocuous, an environment that was unlike any interrogation room.  The location of a coffee shop conveyed to Defendant that he was meeting with the agent to talk, instead of conveying to Defendant that he was the subject of a criminal interrogation.

While the interrogation was short in duration - 30 to 45 minutes, and Defendant was not in custody, Agent Wilson's coercive tactics affected Defendant's ability to give a voluntary confession.  Defendant was counseled by the agent to come alone, not bring his wife.  He was told by Agent Wilson that he needed to "do the right thing" - meaning to

both of them in terms of his religion.  He was told that he would not be arrested and Agent Wilson expressly told him that the agent was not there to send him to jail.  The meeting place, selected by Agent Wilson, was a coffee shop where Agent Wilson bought Defendant a smoothie.  Defendant's only prior experience with a criminal interrogation involved being read his *Miranda* rights and signing a waiver form before the agents asked him questions in the back of a law enforcement vehicle.  In contrast, at the Starbuck's interrogation, Defendant tried to figure out if he was being interrogated - he asked whether he needed an attorney and Agent Wilson told him "I'll let you know when you need one."  All of these facts show that Agent Wilson acted coercively to create an environment in which Defendant's ability to understand the legal consequences attached to his talk with Agent Wilson and provide a voluntary confession was affected.

The Court now considers the effect of Agent Wilson's coercive tactics on Defendant, given Defendant's personal characteristics.  Most of Defendant's characteristics make him neither more or less susceptible to coercive tactics.  No evidence was presented that Defendant suffers from any intellectual deficiencies.  He is in his thirties and was employed at the time of the interrogation as an officer at an Arizona Department of Corrections prison.  At the time of the interrogation, Defendant was not under the duress of any health conditions.  Yet, Defendant is not an hardened criminal who is familiar with the criminal investigation process.  Aside from his job with the prison, Defendant appears to have little experience with the criminal justice system.  No evidence of criminal history was presented.  The only evidence of Defendant's experience with interrogation was evidence of the first interrogation in September 2008 when Defendant was read his *Miranda* rights and did not confess.

One characteristic of Defendant does concern the Court because it is the one exploited by Agent Wilson.  Defendant is a devout Mormon.  Defendant's religion was heavily relied upon by law enforcement in the interrogation to obtain a confession.  Defendant was raised in the Mormon church and still practices.  He attends weekly

church meetings, reads scriptures with his wife daily, prays, follows the rules, wears religious undergarments and tithes.  Defendant's wife became a Mormon so that she could marry Defendant and Defendants siblings are also members of the church.  Because of his devout faith Defendant was particularly susceptible to the agent's heavy reliance on their shared faith to obtain the confession.

Agent Wilson's reliance on his shared Mormon faith with Defendant is a form of excessive friendliness, which can affect that voluntariness of a confession.  Excessive friendliness on the part of an interrogator can be deceptive and is a consideration in determining the voluntariness of a confession.  *See Spano v. New York*, 360 U.S. 315, 323 (1959) (police officer, who was suspect's childhood friend, told suspect that his job would be in jeopardy if the suspect did not confess and that the loss of his job would be disastrous for his family); *Leyra v. Denno*, 347 U.S. 556, 559 (1954) (police psychiatrist, after telling suspect that he was a doctor who would help him with a sinus headache, told suspect how much he wanted to help him with his legal predicament and described how good suspect would feel if he unburdened his conscience).  Excessive friendliness "might create an atmosphere in which a suspect forgets that his questioner is in an adversarial role, and thereby prompt admissions that the suspect would ordinarily make only to a friend, not to the police."  *Miller v. Fenton*, 796 F.2d 598, 607 (3rd Cir.1986).

From their initial phone conversation, Agent Wilson asserted himself as a spiritual counselor to Defendant.  When Defendant refused to meet with Agent Wilson, the agent immediately asked if Defendant was a Mormon and when Defendant said yes, Agent Wilson offered himself as a worthy temple recommend Mormon.  Agent Wilson talked to Defendant about the tenets of their shared religion including the requirements to be truthful and respect authority.  Agent Wilson counseled Defendant to "do the right thing" in the context of their religion.  Both Agent Wilson and Defendant understood Agent Wilson's urging to be in the context of their religion.  When Defendant called Agent Wilson to cancel the meeting, Agent Wilson counseled him "I think we need to get this

taken care of, the sooner you get this taken care of, the better it is for everybody."  (TR at 43).

Agent Wilson presented himself to Defendant in a non-adversarial role.  He "built rapport" with Defendant as a esteemed member of Defendant's church and he counseled Defendant to do the right thing in the context of their shared religion.  When Defendant met with Agent Wilson at the Starbuck's, Agent Wilson remembers the interrogation in detail because he says it was one of the few times where it seemed like a relief for a defendant to talk about a crime.  Defendant cried during the interrogation at Starbuck's and confided to Agent Wilson that he had been sexually abused as a child.  Agent Wilson described the interrogation as "very emotional, cathartic".  (TR at 49).

This testimony shows Defendant was confiding in a fellow church-member about past abuses and transgressions.  It does not show a suspect who is aware that he is talking to law enforcement agents in an interrogation.  Agent Wilson commingled his role of FBI agent with his role of well-respected member of the Mormon church such that separating the two roles would have been difficult for anyone with Defendant's characteristics.

To give a voluntary confession, Defendant needed to have all the considerations on the table so he could weigh those considerations and make an unconstrained choice to talk to Agent Wilson.  Defendant needed to know that this meeting at a Starbuck's with a fellow well-respected Mormon was not some type of cathartic religious confession but rather, a criminal interrogation.  Agent Wilson acted to intentionally hide the nature of the meeting from Defendant.

Considering the totality of the circumstances, Defendant's confession was not voluntary.  Agent Wilson used coercive tactics, including not informing Defendant of his constitutional rights when Defendant inquired of them, creating a false environment at a coffee shop, counseling Defendant to attend the talk alone, falsely telling Defendant that he was not there to send Defendant to jail or arrest him and using Defendant's religion against him.  In that situation, Defendant's will was overborne.

As a final note, the Ninth Circuit discussed the use of one's religion in seeking a confession in *United State v. Miller*. 984 F.2d 1028, 1031 (9th Cir.1993). In *Miller*, the federal agent used defendant's religious beliefs to encourage him to confess. The agent expressed concern to defendant that defendant may have recognized the legal, social and moral ramifications of the activities for which he was interrogated but the agent told him he was worried he had not considered the spiritual ramifications. *Id*. at 1031-1032. The agent encouraged defendant that his religious beliefs required a confession and restitution and that telling the agent the truth about what happened could be a way to meet those requirements. *Id*. at 1032. The defendant eventually confessed and then argued in his criminal proceedings that his confession was not voluntary. The Court disagreed. The Court found there was no evidence that defendant's will was overborne specifically because there was a lacking causal relationship between the agent's lecture and defendant's confession two days later. *Id*. Also, at the suppression hearing, the defendant admitted the confession had nothing to do with religion. *Id*.

Unlike *Miller*, the case before this Court has a direct causal relationship between the agent's use of religion and Defendant's confession. Defendant told Agent Wilson that he had no interest in meeting with him. When he refused to meet, Agent Wilson brought up their shared faith and then talked in detail with Defendant about the tenets of their faith. When Defendant met with Agent Wilson at Starbuck's, they again talked about their shared faith. Agent Wilson repeatedly encouraged Defendant "to do the right thing" and talk to him about the child pornography. Both Agent Wilson and Defendant understood this urging to be in the context of their shared faith. Agent Wilson asserted himself as a worthy church member who counseled Defendant. Agent Wilson's tactics, including his use of religion, eventually led to Defendant's confession.

//

//

//

**RECOMMENDATION**

For the reasons set out above, the Magistrate Judge recommends that the District Judge, after his independent review, GRANT Defendant's Motion to Suppress Statements (Doc. 28).

Pursuant to Federal Rule of Criminal Procedure 59(b)(2), any party may serve and file written objections within fourteen days of being served with a copy of the Report and Recommendation.  If objections are not timely filed, they may be deemed waived.  The parties are advised that any objections filed are to be identified with the following case number: **CR 09-2292-FRZ**.

**DATED this 10th day of February, 2011.**

**CHARLES R. PYLE**
**UNITED STATES MAGISTRATE JUDGE**