**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>               Plaintiff,<br><br>v.<br><br>Daniel Aaron Miller,<br><br>               Defendant. | No. CR-09-02292-TUC-FRZ (BGM)<br><br>**REPORT AND RECOMMENDATION** |

Currently pending before the Court is Defendant Daniel Aaron Miller's Motion to Dismiss Certain Allegations in Superseding Petition to Revoke Supervised Release for Unreasonable Delay (Doc. 118). The Government has filed its response and Defendant replied. Govt.'s Response to Def.'s Mot. to Dismiss Allegations in Pet. to Revoke Supervised Release (Doc. 123); Def.'s Reply to Govt.'s Response to Mot. to Dismiss Certain Allegations in Superseding Pet. to Revoke Supervised Release for Unreasonable Delay (Doc. 124). Defendant Daniel Aaron Miller is charged with violating certain conditions of supervised release including a) failing to register his employment/volunteer work with the sex offender registry in violation of Mandatory Condition #5; b) failing to disclose a secondary employment (violating is responsibility to submit accurate and complete monthly supervision reports) in violation of Standard Condition #2; c) having contact with children (other than his own) under the age of 18 in violation of Special Condition #8; and d) engaging in ongoing business and/or volunteer activity where he had the potential to be alone with children under the age of 18, without written

permission, in violation of Special Condition #9. 2d Superseding Pet. to Revoke (Doc. 131). On July 2, 2020, the Government dismissed Count D.[1] Minute Entry 7/2/2020 (Doc. 128).

Pursuant to LRCrim. 5.1, this matter came before Magistrate Judge Macdonald for oral argument and a report and recommendation. The Magistrate Judge recommends that the District Court, after its independent review, deny Defendant's motions.

I.   **FACTUAL AND PROCEDURAL BACKGROUND**

On July 18, 2011, Defendant Daniel Aaron Miller entered a plea of guilty to Possession of Child Pornography, as charged in Count 2 of the Superseding Indictment. *See* Judgment & Commitment (Doc. 94). On July 18, 2012, Defendant was sentenced to one (1) year of incarceration with the Bureau of Prisons, followed by lifetime supervised release. *Id.* Defendant's supervision began on July 16, 2013 following his release from the Bureau of Prisons. On March 6, 2020, the Court ordered the issuance of an arrest warrant based on a petition submitted by U.S. Probation. *See* Pet. to Revoke (Doc. 101); Warrant Return (Doc. 103). The alleged violations each pertain to Defendant's undisclosed employment at horse stables where he had repeated contact with minors, and his failure to report that contact. *See* Pet. to Revoke (Doc. 101). His contact with minors also included having at least one minor spend the night at his home, which Miller also failed to report. *Id.* at 2 ¶ B.

   A.   ***Probation Officer Courtney Robinson***

Courtney Robinson has been a United States Probation Officer ("USPO") for twenty (20) years. Hr'g Tr. 8/26/2020 (Doc. 143) at 7:19–24. USPO Robinson has supervised Daniel Miller since 2017. *Id.* at 7:25–8:5. USPO Robinson testified that when a probation officer begins supervising someone, they complete an intake process which includes reviewing the original Judgment and Commitment, and any other

---

[1] The Government confirmed its intention to Dismiss Count D of the Second Superseding Indictment (Doc. 131) at the evidentiary hearing. Minute Entry 8/26/2020 (Doc. 138).

- 2 -

documents that reflected changes in conditions or other occurrences. *Id.* at 8:3–13. USPO Robinson further testified that Mr. Miller's file reflects that he has had five (5) probation officers during his supervision. *Id.* at 8:14–9:7. On December 27, 2017, USPO Robinson completed an intake with Mr. Miller. *Id.* at 9:12–16. USPO Robinson testified that during that meeting, she went over Mr. Miller's conditions with him, including that 1) he was required to notify her of any contact with minors; 2) he was required to report any places where he worked or volunteered; and 3) that he was required to provide monthly reports regarding his residence, employment, supervisors, telephone numbers, vehicle information, and financial information. Hr'g Tr. 8/26/2020 (Doc. 143) at 9:19–10:15, 11:12–12:17. USPO Robinson further testified that although she received monthly reports from Mr. Miller, he never reported having had contact with minors as required or mentioned spending time, working, or volunteering at East Prospect Lane Stables. *Id.* at 12:16–13:6, 27:8–16, 39:17–40:4.

USPO Robinson also testified that as part of her supervision of Mr. Miller she made eight (8) home visits, five (5) office visits, attempted nine (9) additional attempted home visits, as well as had office visits and telephone calls with him. *Id.* at 13:10–24. USPO Robinson testified that during each visit with Mr. Miller she would inquire about changes in his situation, his residence, who was living at the residence, his employment, any contact with minors, and other factors related to risk for sex offenders. *Id.* at 13:25–14:11, 39:8–41:5. USPO Robinson further testified that Mr. Miller did not report any contact with minors to her. *Id.* at 14:8–13, 39:8–41:5. USPO Robinson also testified that Mr. Miller did not mention spending time, working, or volunteering at East Prospect Lane Stables and that she was unaware of his activities there. Hr'g Tr. 8/26/2020 (Doc. 143) at 14:20–15:1, 15:25–16:1. USPO Robinson understood that Mr. Miller worked at Arizona Feeds. *Id.* at 15:2–5, 27:17–18, 37:7–14. USPO Robinson testified that because Mr. Miller did not have a cellular telephone, she would contact him through his work. *Id.* at 15:6–11, 27:19–21. USPO Robinson further testified that it was difficult to find Mr. Miller at home, as well. *Id.* at 15:6–24. Mr. Miller would tell USPO Robinson that he

1 had been out on a walk when she stopped by and he was not home. *Id.* at 15:6–24.

2 USPO Robinson testified that in January of this year, she received a phone call from the Department of Child Safety regarding an investigation that had been opened "based on a police report of alleged criminal activity that [the Miller family] engaged in at the horse stables."[2] Hr'g Tr. 8/26/2020 (Doc. 143) at 16:2–17. USPO Robinson described the alleged criminal activity as sexual molestation of a minor which took place at the stables. *Id.* at 16:18–23. USPO Robinson testified that because she was unaware of Mr. Miller's activities at the stable, she reached out to his two previous probation officers to see if they were familiar with his activities there. *Id.* at 16:24–17:2. USPO Robinson learned that neither of Mr. Miller's two previous probation officers knew anything about the stables, so she contacted the stables directly. *Id.* at 17:3–14. USPO Robinson testified that she spoke with Christine Johnson, who confirmed that Mr. Miller was a past or current employee of the stables. *Id.* at 17:15–18:6, 24:1–21, 30:19–25. Ms. Johnson informed USPO Robinson that she was aware of Mr. Miller's conviction, as well as the condition that he was not to have contact with minors. Hr'g Tr. 8/26/2020 (Doc. 143) at 17:15–18:6, 24:1–21. Ms. Johnson further opined her belief in Mr. Miller's innocence and that he had been harassed for seven (7) years. *Id.* at 17:15–18:6, 24:1–21, 31:7–10. Ms. Johnson also reported that Mr. Miller had daily contact with his son, and that minors were present at the stables in the mornings but not in the afternoon when Mr. Miller was present. *Id.* at 24:1–21, 31:11–17, 35:6–7.

USPO Robinson also requested any and all police reports involving Daniel Miller. *Id.* at 18:7–19:7. USPO Robinson testified that she received multiple police reports from the Tucson Police Department ("TPD"), as well as the sheriff's department. *Id.* at 19:8–12, 35:13–36:3. USPO Robinson further testified that she had performed a file review;

---

[2] USPO Robinson explained that there were two DCS works, one from an earlier case in which a DCS worker made a report of sexual abuse, but that report was never received by the probation department until 2020. Hr'g Tr. 8/6/2020 (Doc. 143) at 28:10–25. USPO Robinson spoke with a second DCS worker who "opened an investigation into the Miller family, which was subsequent to the criminal investigation in TPD." *Id.*

- 4 -

1  however, the police reports were the first time that she became aware of the allegations
2  regarding Mr. Miller's activity at the stable and contact with children.  Hr'g Tr.
3  8/26/2020 (Doc. 143) at 19:13–20:5, 25:19–22.  USPO Robinson also testified that Mr.
4  Miller's file reflected that he had been contacted by the sheriff's department about
5  possible contacts with minors, and his prior probation officer had asked for police
6  reports; however, they had not been received.  *Id.* at 19:23–20:8.

7        USPO Robinson testified that upon receiving the police reports and staffing the
8  matter with her supervisor, she filed a petition to revoke.  *Id.* at 20:9–11, 34:17–21.  At
9  the time of hearing there was a second superseding petition to revoke filed, with
10 allegations including Mr. Miller's failure to register his place of employment or volunteer
11 work; to provide accurate reports by failing to disclose secondary employment; and
12 unauthorized contact with minors.  *Id.* at 20:12–23, 21:12–19, 26:17–27:7.  USPO
13 Robinson further testified that she spoke with Mr. Miller regarding the violations, who
14 confirmed his work at the stables.  *Id.* at 21:20–22:13.  USPO Robinson instructed Mr.
15 Miller not to return to the stables because he was not to have contact with minors or be in
16 a position where he could be alone with minors, and that the probation office did not have
17 any knowledge regarding his activities at the stable.  Hr'g Tr. 8/26/2020 (Doc. 143) at
18 22:4–13, 34:22–35:5.  Mr. Miller claimed, contrary to the file and the information
19 provided by his previous probation officers to USPO Robinson, that he had told one of
20 his probation officers about his work at the stables.  *Id.* at 22:4–17, 23:4–8.  It was during
21 this interview that USPO Robinson learned that Mr. Miller owned horses that he boards
22 at the stables, and he worked in exchange for boarding.  *Id.* at 29:1–15.  USPO Robinson
23 made notes to the file regarding her conversations with Ms. Johnson and Mr. Miller.  *Id.*
24 at 23:10–24:21.

25       USPO Robinson testified that Mr. Miller had been subject to frequent polygraph
26 examinations with the probation department.  *Id.* at 32:9–14.  USPO Robinson further
27 testified that the polygraph results showed that Mr. Miller was being nondeceptive.  Hr'g
28 Tr. 8/26/2020 (Doc. 143) at 32:15–18.  USPO Robinson also acknowledged that the notes

from the polygraphs mentioned Mr. Miller enjoying spending time with his horses, but the home visit notes did not mention horses on the property. *Id.* at 32:19–34:6.

### B.     Christine Johnson

Christine Johnson is the owner of the East Prospect Lane Stables, a stable and horse boarding business. Hr'g Tr. 8/26/2020 (Doc. 143) at 42:6–12. Ms. Johnson testified that aside from owning the stables, she has worked as an insurance processor for fifty (50) years. *Id.* at 42:13–22. Ms. Johnson described the stables as a two (2) acre property that can handle up to twenty-four (24) horses, but they currently have ten (10). *Id.* at 42:23–43:1. Ms. Johnson further testified that she has owned the stables for forty-two (42) years and currently has seven (7) boarders, including the Millers. *Id.* at 43:2–7. Ms. Johnson also confirmed that there was a swimming pool on the property that she shares with her boarders, their families, and the neighborhood. *Id.* at 43:8–18.

Ms. Johnson testified that she has known Mr. Miller for a long time and that he is like family to her. Hr'g Tr. 8/26/2020 (Doc. 143) at 43:19–24. Ms. Johnson further testified that she rejected the nature of Mr. Miller's conviction because she believed that he had not committed the offense and took the fall for a roommate. *Id.* at 44:5–20. Ms. Johnson testified that this belief was based on Mr. Miller's representations to her, as well as two other individuals telling her that Mr. Miller did not commit the crime. *Id.* Ms. Johnson confirmed that when Mr. Miller returned in 2013 that she was aware he was on supervised release. *Id.* at 44:21–25. Ms. Johnson testified that when Mr. Miller returned from prison in 2013, he was already boarding two (2) horses at the stables. *Id.* at 45:1–11.

Ms. Johnson further testified that Mr. Miller performed maintenance including welding and other handyman tasks on the property. Hr'g Tr. 8/26/2020 (Doc. 143) at 45:12–20. Ms. Johnson noted that Mr. Miller helped out a lot and his tasks included repairing broken water lines and going to get hay. *Id.* at 46:9–15. Ms. Johnson testified that Mr. Miller originally bought hay from the feed store, but at some point, changed to getting it from the farm. *Id.* at 46:16–22. Ms. Johnson was unsure of where the hay farm

was in relation to her stables, but indicated that she believed the farm to be in Marana and noted her stables were located at Mountain and Limberlost. *Id.* at 46:23–47:7. Ms. Johnson also testified that she would see Mr. Miller a minimum of five (5) times per week. *Id.* at 45:21–23. Ms. Johnson confirmed that Mr. Miller was expected to pay to board his horses. Hr'g Tr. 8/26/2020 (Doc. 143) at 45:24–46:8.

Ms. Johnson also confirmed that Mr. Miller was welcome to invite friends of his family to her property which included people going swimming, people helping him work with the horses or doing repairs, and children/boys under the age of eighteen (18). *Id.* at 47:8–25. Ms. Johnson testified that such invitations occurred after 2013. *Id.* at 48:1–2. Ms. Johnson further testified that she observed Mr. Miller with the Calhoun family, which included four (4) boys, on her property. *Id.* at 48:3–13. Ms. Johnson also testified that in 2015 she observed Mr. Miller and the Calhoun boys without other adults. *Id.* at 48:14–17. Ms. Johnson explained that Mr. Miller would call her and tell her that he was bringing someone out to see the horses and possibly ride, and she would go out and meet the family when possible. Hr'g Tr. 8/26/2020 (Doc. 143) at 48:23–49:8. Ms. Johnson noted that Mr. Miller would often introduce families to her at church. *Id.* at 64:23–24. Ms. Johnson testified that when on the property the family and children were welcome to swim and sometimes some of the boys would accompany Mr. Miller to do work on the property. *Id.* at 49:9–15. Ms. Johnson further testified that she witnessed Mr. Miller swimming or working with different children on multiple occasions. *Id.* at 49:16–22. Ms. Johnson noted that visitors were welcome to use either her house or one of the tack rooms to change into their swimsuits. *Id.* at 49:23–50:1. Ms. Johnson acknowledged that the tack room had a door and afforded some degree of privacy. Hr'g Tr. 8/26/2020 (Doc. 143) at 62:11–63:13.

Ms. Johnson testified that when Mr. Miller initially returned from prison, she understood that he was not to have any contact with minors. *Id.* at 50:5–9, 56:5–8. Ms. Johnson further testified that she learned of this restriction from Mr. Miller and his wife, and that no one from the United States Probation Office contacted her. *Id.* at 50:10–14.

- 7 -

Subsequently, Mr. Miller asked Ms. Johnson if he could bring the Calhouns to the stables, and she asked if that was acceptable to his conditions. *Id.* at 50:15–21. Mr. Miller told Ms. Johnson that it was okay, and her understanding was that he could be around children with parental consent. *Id.* at 50:15–21, 56:9–19, 57:15–21. Ms. Johnson also testified that after 2015, the boys would ask Mr. Miller if he was going to the farm for hay. Hr'g Tr. 8/26/2020 (Doc. 143) at 50:22–51:5. Ms. Johnson testified that Mr. Miller would ask the parents for permission to take a boy(s) with him to get hay, and they would say yes. *Id.* at 51:6–10, 56:17–22. Ms. Johnson further testified that there were times when Mr. Miller returned from a hay pickup accompanied by a child(ren) without other adults present. *Id.* at 51:14–24, 61:13–22. Ms. Johnson acknowledged that she was not responsible for supervising Mr. Miller and was not concerned about his activities. *Id.* at 51:25–52:4, 64:1–5. Ms. Johnson also testified that minor young men would help Mr. Miller on the property, including repairing a water leak, learning how to weld, and cleaning out his stalls, as well as riding the horses. *Id.* at 52:5–53:3, 60:5–61:12. Ms. Johnson noted that usually Mr. Miller's wife or the children's parents were present, until Ms. Johnson felt comfortable, from a safety perspective, with the children being left without the parents. Hr'g Tr. 8/26/2020 (Doc. 143) at 53:4–10, 64:6–9. Ms. Johnson further noted that even when parents were on the property, they were not usually involved in the activity that Mr. Miller and the children were undertaking. *Id.* at 53:17–22. Ms. Johnson acknowledged that although there were usually other people present with Mr. Miller and children, there were times when he and the child(ren) were alone. *Id.* at 53:23–54:8, 62:2–11.

Ms. Johnson testified that she did not pay Mr. Miller for his work and objected to USPO Robinson's testimony that Ms. Johnson stated he was an employee. *Id.* at 54:9–15. Ms. Johnson admitted that she did tell USPO Robinson that Mr. Miller worked for her and confirmed that he did perform work for her, but more as part of boarding his horses not as an employee. *Id.* at 54:16–17, 57:8–14, 59:16–60:1. She characterized Mr. Miller's work as fixing things as they broke, but she would not normally call him to come

- 8 -

out specifically to fix something. Hr'g Tr. 8/26/2020 (Doc. 143) at 56:23–57:7, 60:2–4. Ms. Johnson further testified that Mr. Miller was the primary person who went to pick up hay and that this occurred every one (1) to two (2) weeks. *Id.* at 54:18–55:3. Ms. Johnson also testified that she recalled approximately three (3) boys other than the Calhoun children spending time with Mr. Miller. *Id.* at 55:6–10, 59:2–10. Ms. Johnson noted that either she or her tenant Brittani would verify that the child(ren)'s parent consented to Mr. Miller bringing them to the property, but admitted that they did not always personally obtain consent, relying on the Millers' word. *Id.* at 57:20–24, 64:10–22. Ms. Johnson explained that she lived on the south side of the stables and Brittani lived on the north side of the stables. *Id.* at 57:25–58:8. Ms. Johnson opined that it is almost impossible to be alone with someone in the stables because either she or Brittani or one of her two (2) other tenants were on the property. Hr'g Tr. 8/26/2020 (Doc. 143) at 58:9–14.

### C. *Britanni Deters*

Brittani Deters lives and boards at the East Prospect Lane Stables. Hr'g Tr. 8/26/2020 (Doc. 143) at 66:17–20. Ms. Deters lives and helps out at the stables, but also works as an insurance processor. *Id.* at 66:24–67:5. Ms. Deters testified that she has been working as an insurance processor for approximately two and a half (2 1/2) years and works for the same company as Ms. Johnson. *Id.* at 67:6–13. Ms. Deters confirmed that she was friends with the Miller family, having met them at the stables approximately four (4) or five (5) years ago, after Mr. Miller's child pornography conviction. *Id.* at 67:17–25, 68:18–19. Ms. Deters testified that she and the Millers were close friends of Ms. Johnson's and they were all like family. *Id.* at 68:22–69:1. Ms. Deters obtained her understanding regarding Mr. Miller's conviction from Mr. Miller, his wife, and Ms. Johnson. Hr'g Tr. 8/26/2020 (Doc. 143) at 68:1–13. Ms. Deters described Mr. Miller as having been almost bullied into taking the plea, and someone else was guilty of the crime. *Id.* at 68:1–13. Ms. Deters testified that Mr. Miller told her that he was not guilty and she believed him. *Id.* at 68:14–17. Prior to Mr. Miller's arrest, Ms. Deters saw him

Case 4:09-cr-02292-FRZ-BGM   Document 144   Filed 10/30/20   Page 10 of 20

at the stables almost daily. *Id.* at 69:5–7. Ms. Deters acknowledged that she wanted to see Mr. Miller released. *Id.* at 77:11–13.

Ms. Deters testified that Mr. Miller did not perform handyman work per se, rather he fixed things as they arose, but noted that everyone who boards horses there helps out. Hr'g Tr. 8/26/2020 (Doc. 143) at 69:8–25. Initially, Ms. Deters described a "your-horse-broke-it-you-fix-it" type of policy, but acknowledged equipment such as the welder required specialized skill, which Mr. Miller possessed, and limited who could perform such repairs. *Id.* at 69:8–70:11, 76:21–77:4, 78:6–11. Ms. Deters denied that she had previously told the prosecutor that Mr. Miller did more around the stables than other people and sought to describe the atmosphere as a community group where everyone contributed. *Id.* at 76:15–77:10, 78:12–79:2. Ms. Deters testified that there were minors, children under the age of eighteen (18), on the property occasionally. *Id.* at 70:15–18. Ms. Deters further testified that she observed Mr. Miller on the property with multiple different minors, multiple times. *Id.* at 70:19–71:3. Ms. Deters also testified that she would usually meet the children and that they were of various ages including boys that were in the eight (8) to twelve (12) range. Hr'g Tr. 8/26/2020 (Doc. 143) at 71:4–25. Ms. Deters indicated that she was unaware that Mr. Miller had any specific restriction about children in the prior couple of years, but acknowledged that she knew when he had an ankle monitor there was a no contact with children restriction. *Id.* at 72:1–7. Ms. Deters admitted that it was not her job to supervise Mr. Miller, and she did not verify parental consent for any of the children. *Id.* at 81:24–82:5.

Ms. Deters testified that she was uncertain regarding the number of different families or boys that Mr. Miller brought to the property, but indicated that she would recognize five (5) or six (6) of them. *Id.* at 72:8–12, 75:1–4, 76:5–7. Ms. Deters worked with some of the children giving them lessons. *Id.* at 74:24–75:4. Ms. Deters testified that she met the boys through Mr. Miller and was originally under the impression that they were either family or long-time family friends. Hr'g Tr. 8/26/2020 (Doc. 143) at 75:8–19, 75:24–76:4. Ms. Deters confirmed that the children were not always

accompanied by their parents, and that they would usually visit the stables with Mr. Miller on multiple occasions. *Id.* at 75:5–23, 76:5–11.

Ms. Deters described the boys' activities with Mr. Miller to include riding horses, helping clean stalls, swimming, and going to the hay farm and helping unload the hay. *Id.* at 72:13–18, 73:13–20, 79:3–80:6, 80:21–81:3, 81:21–22. Ms. Deters testified that the hay farm is Sierra Farms in Red Rock, approximately forty-five (45) to fifty (50) minutes away from the stables. *Id.* at 72:19–25. Ms. Deters confirmed that going to get hay involved an hour-and-a-half car ride, round trip. *Id.* at 73:1–4, 79:16–22. Ms. Deters acknowledged seeing Mr. Miller and the boys returning to the stables from the hay farm and exiting his vehicle together. Hr'g Tr. 8/26/2020 (Doc. 143) at 73:5–12, 76:12–14. Ms. Deters stressed that the stables are open and although the tack rooms have doors, they lack doorknobs and locks. *Id.* at 73:16–74:23. Ms. Deters admitted, however, that a child could change into their swimwear in a tack room without being seen. *Id.*

### D.   *Second Superseding Petition for Revocation*

The Second Superseding Petition for Revocation alleges three (3) violations by Mr. Miller of his supervised release. 2d Superseding Pet. for Revocation (Doc. 131). The allegations are as follows:

| **Allegation** | **Nature of Noncompliance** |
|---|---|
| A | **Mandatory Condition #5** which states, If applicable, you must comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, et seq.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which you reside, work, are a student, or were convicted of a qualifying offense.<br><br>1. On or about September 6, 2013, Daniel Miller failed to register his employment/volunteer work at East Prospect Lane Stable, as discovered by the Pima County Sheriff's Department during a registration compliance check and documented in Case Report No.: 130906109, Grade C violation. § 7B1.1(a)(3) |

- 11 -

    2. On or about August 16, 2018, Daniel Miller failed to register his employment/volunteer work at East Prospect Lane Stable as discovered by the Pima County Sheriff's Department during a registration compliance check and documented in Case Report No.: 180816185.  Grade C violation.  § 7B1.1(a)(3)

B  **Standard Condition #2** which states, After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.

  For the months of January and February 2020, Daniel Miller failed to submit accurate and complete monthly supervision reports as instructed by failing to disclose a secondary employment.  Miller was employed as a maintenance worker at East Prospect Lane Boarding Stables, as evidenced by a statement made to the probation officer by Christine Johnson, the owner/operator of the stables, on February 25, 2020.  He failed to include this place of employment on his monthly supervision reports.  Grade C violation.  § 7B1.1(a)(3)

C  **Special Condition #8** which states, You must not be in the company of or have contact with children who you know are under the age of 18, with the exception of your own children.  Contact includes, but is not limited to, letters, communication devices, audio or visual devices, visits, or communication through a third party.

  1. On or about February 19 and 20, 2015, Daniel Miller had contact with children, as evidenced by a statement from the children's mother to a Pima County Sheriff's Detective in Case No.: 1502090258, in which she reported both her minor children, a 14-year-old male and his younger sister, spent the night at the Miller's home while Miller and his wife were present.  Grade C violation § 7B1.1(a)(3).

  2. On or about February 9, 2015, Miller had contact with a minor as evidenced by a statement by the minor and his mother to a Pima County Sheriff's detective in Case No.:

1502090258, in which the minor reported accompanying Miller delivering hay approximately 25 times. Grade C violation § 7B1.1(a)(3).

3. On or about January 2, 2020, Miller had contact with a minor as evidenced by a statement made by the minor and his mother to a Tucson Police Department detective in Case No.: 2001020052, in which the minor reported being alone with Miller at a horse stable on a weekly basis. Grade C violation § 7B1.1(a)(3).

4. In about July 2017 to about January 2020, Miller had unauthorized and unreported contacts with minors as evidenced by a statement made by an employee of the East Prospect Lane Horse Stables to a Tucson Police Department Detective in Case No.: 2001020052, in which the employee reported seeing Miller with minors at the stables and taking minors on hay deliveries. Grade C violation § 7B1.1(a)(3).

2d Superseding Pet. for Revocation (Doc. 131) at 1–2.

## II.     ANALYSIS

### A.     *Motion to Dismiss*

Defendant asserts that all of the allegations at issue in the Petition to Revoke "occurred or began at least five years ago." Def.'s Mot. to Dismiss (Doc. 118) at 1. Defendant further asserts that "[t]he United States Probation Office has known of these alleged violations since they supposed, as contemporaneous police reports were generated." *Id.* at 1–2. Defendant points to the Probation Department's filing of waivers and orders regarding modification of his conditions of release, which did not address the alleged violations at issue here, as evidence that Probation has unreasonably delayed the initiation of revocation proceedings. *Id.* at 2; *see also* Waiver and Order (Docs. 97 & 99).

"In advancing his unreasonable delay argument, [Defendant] relies on *United States v. Hamilton*, 708 F.2d 1412 (9th Cir. 1983), and *United States v. Tyler*, 605 F.2d 851 (5th Cir. 1979) (per curiam), cases in which [the Ninth Circuit Court of Appeals] and

another circuit court of appeals reversed district court revocations of probation[] because there had been an unreasonable delay in bringing revocation proceedings after the factual basis for the pertinent violations was known." *United States v. Misraje*, 888 F.3d 1113, 1116 (9th Cir. 2018). Defendant asserts that Detective S.A. Anders spoke with United States Probation Officer ("USPO") Pedro Valenzuela regarding "rumors" that Defendant had been around kids. Def.'s Reply (Doc. 124) at 2. USPO Valenzuela "assured [Detective Anders that] Miller had repeatedly passed polygraph examinations asking if he had contact with minors." *Id.* Defendant alleges that Detective Anders "expressed his concerns to and shared information with the USPO" three times. *Id.* at 3. Defendant further asserts that "[p]art of the investigation looked into Miller's behavior within the 'horse world,' and very likely led to East Prospect Lane Stable." *Id.* at 4.

"The USPO's inability to uncover a violation due to a supervisee's obstruction does not excuse the violation." *Misraje*, 888 F.3d at 1116. Defendant's ability to lie with enough skill to pass a polygraph should not excuse his violation. Moreover, like the defendant in *Misraje*, Defendant is contending that the USPO "should have known" that he was affiliated with the East Prospect Lane Stable. *See Misraje*, 888 F.3d at 1116. "Not only does the argument lack factual support, there is also no legal authority for a 'should have known' standard." *Id.* "It is a supervisee's obligation to strictly comply with the terms of supervised release." *Id.* (citing 18 U.S.C. § 3583(e)(3)). Defendant did not strictly comply with the terms of his supervised release and purposefully misled his probation officer regarding his activities. Defendant's effective subterfuge prevented the USPO from learning about his violations. As such, the probation office did not unreasonably delay the initiation of a petition for revocation of supervised release in this matter. The Court recommends denial of Defendant's motion to dismiss.

### B.     Allegations

The Court may revoke a term of supervised release if it finds by a preponderance of the evidence that the Defendant violated a condition of supervised release. 18 U.S.C. § 3583(e)(3).

### **1. Mandatory Condition No. 5**

Mandatory Condition No. 5 requires Defendant to "comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, et seq.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which you reside, work, are a student, or were convicted of a qualifying offense." Superseding Pet. for Revocation (Doc. 131) at 1. The Government alleges that the Defendant has violated this condition because "[o]n or about September 6, 2013, Daniel Miller failed to register his employment/volunteer work at East Prospect Lane Stable, as discovered by the Pima County Sheriff's Department during a registration compliance check and documented in Case Report No.: 130906109, Grade C violation. § 7B1.1(a)(3)[.]" Superseding Pet. for Revocation (Doc. 131) at 1 (Allegation A(1)). The Government further alleges that the Defendant has violated this condition because "[o]n or about August 16, 2018, Daniel Miller failed to register his employment/volunteer work at East Prospect Lane Stable as discovered by the Pima County Sheriff's Department during a registration compliance check and documented in Case Report No.: 180816185. Grade C violation. § 7B1.1(a)(3)[.]" Superseding Pet. for Revocation (Doc. 131) at 1–2 (Allegation A(2)). USPO Robinson testified that although she received monthly reports from Defendant, he never reported spending time, working, or volunteering at East Prospect Lane Stables. Hr'g Tr. 8/26/2020 (Doc. 143) at 12:16–13:6, 27:8–16, 39:17–40:4. After receiving the police reports regarding Defendant, USPO Robinson spoke with him regarding the violations, and he confirmed his work at the stables. *Id.* at 21:20–22:13. USPO Robinson further testified that Christine Robinson, the owner of the stables, confirmed that Defendant was a past or current employee of the stables. *Id.* at 17:15–18:6, 24:1–21, 30:19–25. Ms. Johnson denied that she told USPO Robinson that Defendant was an employee, but admitted that she informed USPO Robinson that Defendant did perform work for her as part of the boarding of his horses. *Id.* at 45:12–20, 54:9–17, 57:8–14, 59:16–60:1. This work included maintenance such as welding and other handyman tasks on the property. *Id.* at 45:12–20. Ms. Johnson also acknowledged

that Defendant was the primary person who went to pick up hay for the stables. Hr'g Tr. 8/26/2020 (Doc. 143) at 54:18–55:3. Britanni Deters, a tenant on Ms. Johnson's property, characterized the work performed by Defendant as no more than the community effort all boarders contributed to keep the property running. *Id.* at 69:8–70:11, 76:21–77:4, 78:6–11, 76:15–77:10, 78:12–79:2. Ms. Deters did admit that Mr. Miller could weld, which was a specialized skill amongst the boarders. *Id.* at 76:21–77:4.

The Court finds USPO Robinson's testimony credible. Furthermore, although Ms. Johnson did not consider Defendant an employee, she did acknowledge that he did work on the property as part of boarding his horses enabling her to keep her rates lower. *Id.* at 54:16–17, 57:8–14, 59:16–60:1. The Court also finds that Ms. Deters attempted to minimize Defendant's work at the stables, and was clear that she did not want him to be found guilty. *Id.* at 69:8–70:11, 76:15–77:10, 78:6–79:2. The evidence supports a finding that Defendant did work at the East Prospect Lane Stables. Moreover, even though Defendant did not receive a salary, his efforts afforded him a lower boarding rate.[3] Additionally, it is undisputed that Defendant spent time at the East Prospect Lane Stables. *Id.* at 45:21–23, 69:5–7. As such, the Court finds that the Government has established by a preponderance of the evidence that Defendant spent time and performed work at the East Prospect Lane Stables without informing his probation officer.

### 2. Standard Condition No. 2

Standard Condition No. 2 instructs Defendant that "[a]fter initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed." Superseding Pet. for Revocation (Doc. 131) at 2. The Government alleges that:

For the months of January and February 2020, Daniel Miller failed to

---

[3] Although every boarder at the stables may have been entitled to the same boarding rate, this does not diminish that Defendant worked on the property in exchange a lower rate—which is consistent with Ms. Deters's testimony that all of the boarders contributed work at the stable.

- 16 -

> submit accurate and complete monthly supervision reports as instructed by failing to disclose a secondary employment. Miller was employed as a maintenance worker at East Prospect Lane Boarding Stables, as evidenced by a statement made to the probation officer by Christine Johnson, the owner/operator of the stables, on February 25, 2020. He failed to include this place of employment on his monthly supervision reports. Grade C violation. § 7B1.1(a)(3)[.]

Superseding Pet. for Revocation (Doc. 131) at 2 (Allegation B). As discussed in Section B.1., *supra*, the Government has met its burden to show that Defendant performed work at the East Prospect Lane Boarding Stables in violation of Standard Condition No. 2.

### 3. Special Condition No. 8

Special Condition No. 8 requires that Defendant "must not be in the company of or have contact with children who you know are under the age of 18, with the exception of your own children. Contact includes, but is not limited to, letters, communication devices, audio or visual devices, visits, or communication through a third party." Superseding Pet. for Revocation (Doc. 131) at 2.

In Allegation C(1), the Government alleges that "[o]n or about February 19 and 20, 2015, Daniel Miller had contact with children, as evidenced by a statement from the children's mother to a Pima County Sheriff's Detective in Case No.: 1502090258, in which she reported both her minor children, a 14-year-old male and his younger sister, spent the night at the Miller's home while Miller and his wife were present. Grade C violation § 7B1.1(a)(3)." Superseding Pet. for Revocation (Doc. 131) at 2. There was no evidence presented at the hearing regarding this allegation. As such, the Government has failed to meet its burden to prove Defendant violated his conditions of release as alleged in Allegation C(1).

In Allegation C(2), the Government alleges that "[o]n or about February 9, 2015, Miller had contact with a minor as evidenced by a statement by the minor and his mother to a Pima County Sheriff's detective in Case No.: 1502090258, in which the minor reported accompanying Miller delivering hay approximately 25 times. Grade C violation § 7B1.1(a)(3)." Superseding Pet. for Revocation (Doc. 131) at 2. Ms. Johnson testified

that Defendant was the primary person who picked up hay and this occurred every one (1) to two (2) weeks. Hr'g Tr. 8/26/2020 (Doc. 143) at 54:18–55:3.  Ms. Johnson further testified that she recalled approximately three (3) boys, other than the Calhoun children, spending time with Mr. Miller at the stables. *Id.* at 55:6–10, 59:2–10. Ms. Johnson also testified that there were times when Defendant returned from a hay pickup accompanied by a child(ren) without other adults present. *Id.* at 51:6–10, 56:17–22. Similarly, Ms. Deters testified that she observed Mr. Miller on the property with multiple different minors on multiple different occasions. *Id.* at 70:19–71:3. Ms. Deters estimated that she would recognize five (5) or six (6) different boys that accompanied Defendant to the stables. *Id.* at 72:8–12, 75:1–4, 76:5–7. Ms. Deters further testified that the boys' activities with Defendant included going to the hay farm and unloading hay, and that she observed Defendant returning to the stables from the hay farm and exiting his vehicle with different boys. Hr'g Tr. 8/26/2020 (Doc. 143) at 72:13–18, 73:5–20, 76:12–14, 79:3–80:6, 80:21–81:3, 81:21–22. Based upon this testimony, the Court finds by a preponderance of the evidence that Defendant violated Special Condition No. 8 by taking unaccompanied minors to the hay farm.

In Allegation C(3), the Government alleges that "[o]n or about January 2, 2020, Miller had contact with a minor as evidenced by a statement made by the minor and his mother to a Tucson Police Department detective in Case No.: 2001020052, in which the minor reported being alone with Miller at a horse stable on a weekly basis. Grade C violation § 7B1.1(a)(3)." Superseding Pet. for Revocation (Doc. 131) at 2. Ms. Johnson testified that she would see Defendant a minimum of five (5) times per week at the stables. Hr'g Tr. 8/26/2020 (Doc. 143) at 45:21–23. Similarly, Ms. Deters testified that she saw Defendant at the stables almost daily. *Id.* at 69:5–7. Ms. Deters also testified that she observed Mr. Miller on the property with multiple different minors on multiple different occasions and estimated that she would recognize five (5) or six (6) different boys that accompanied Defendant to the stables. *Id.* at 70:19–71:3, 72:8–12, 75:1–4, 76:5–7. Ms. Johnson confirmed that she also witnessed Defendant swimming or working

with different children on multiple occasions. *Id.* at 48:14–17, 49:16–22. The Court finds by a preponderance of the evidence that Defendant has violated Special Condition No. 8 and had unaccompanied contact with a minor at the stables on a weekly basis.

In Allegation C(4), the Government alleges that "[i]n about July 2017 to about January 2020, Miller had unauthorized and unreported contacts with minors as evidenced by a statement made by an employee of the East Prospect Lane Horse Stables to a Tucson Police Department Detective in Case No.: 2001020052, in which the employee reported seeing Miller with minors at the stables and taking minors on hay deliveries. Grade C violation § 7B1.1(a)(3)." Superseding Pet. for Revocation (Doc. 131) at 2. Based upon the testimony of Ms. Johnson and Ms. Deters discussed, *supra*, the Court finds that the Government has shown by a preponderance of the evidence that Defendant violated Special Condition No. 8 as alleged in Allegation C(4).

### III.   RECOMMENDATION

For the foregoing reasons, the Magistrate Judge recommends that the District Court:

1)   DENY Defendant Daniel Aaron Miller's Motion to Dismiss Certain Allegations in Superseding Petition to Revoke Supervised Release for Unreasonable Delay (Doc. 118);

2)   Find that the Government has met its burden of establishing that the Defendant violated the conditions of supervised release as set out in Allegations A(1), A(2), B, C(2), C(3), and C(4) of the Second Superseding Petition to Revoke; and

3)   Find that the Government has failed to meet its burden to establish that Defendant violated the conditions of supervised release as set forth in Allegation C(1).

Pursuant to 28 U.S.C. §636(b) and Rule 59(b)(2) of the Federal Rules of Criminal Procedure, any party may serve and file written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. No reply shall be filed unless leave is granted from the District Court. If objections are filed, the parties should

1  use the following case number: **CR-09-02292-TUC-FRZ**.

2  Failure to file timely objections to any factual or legal determination of the
3  Magistrate Judge in accordance with Fed. R. Crim. P. 59 may result in waiver of the right
4  of review.

6  Dated this 30th day of October, 2020.

_____
Bruce G. Macdonald
United States Magistrate Judge